UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 09-CR-20264-KING/BANDSTRA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JUNIOR SYLVIN, et al.

        Defendants.
_____/

**ALL DEFENDANTS' REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATES'S REPORT AND RECOMMENDATION DENYING DEFENDANTS' FIRST MOTION TO SUPPRESS INTERCEPTED WIRE COMMUNICATIONS, REQUEST FOR *FRANKS* HEARING AND  DISCLOSURE OF <u>CONFIDENTIAL INFORMANTS</u>**

       COMES NOW the Defendant, JUNIOR SYLVIN, by and through his undersigned counsel and on behalf of all his co-defendants, through their respective counsel and hereby files his Reply to the Government's Response to his First Motion to Suppress Intercepted Wire Communications and Disclosure of Confidential Informants herein. As grounds therefore, Defendants state as follows:

1. The Government filed its RESPONSE (DE #240) to all Defendants' Objections to the Magistrate's R & R to Deny Defendants' Motion to Suppress the Wire taps herein.

2. This REPLY will attempt to *briefly* address the arguments in said RESPONSE in the order in which they were presented. *In that there has already been an overwhelming amount of written material filed herein, Defendants will seek to paraphrase their arguments here*.

3. The Government argues that their "credible" information, provided to the issuing Court, was that Defendant SYLVIN supplied **multiple kilo** quantities of cocaine to co-defendant,

STERLIN. Upon information and belief, and from review of all the Discovery in this case, it is apparent that the defendants are charged with *ounce* quantities of cocaine, rather than *multi kilo* quantities as sworn to the issuing judge.

4.   The Defendants' have all along, raised issue with the Government's position that they had met the *stringent* requirements of the statute regarding **"the need for interception."** The Government told the issuing judge that they needed the wire taps to **identify all the "drug routes, stash locations, drug proceeds, evidence of homicides"** yet *no such information was gathered from the wire taps*.

5.   The Government's contention that the **alternative investigative techniques** were unavailable has always been a strong bone of contention herein. Their RESPONSE statement that **"no further information was gleaned from these (few controlled buys). No connections were established beyond the instant transaction"**…is *simply false*, based on their own Discovery Response. LEOs in this case used CS1 to make (2) controlled buys from SYLVIN and CS2 to make (4) controlled buys from STERLIN. From the Discovery provided herein, **CS2 had an open invitation from STERLIN** for *future* narcotics activity (**which was** *never explored* **by LEOs** past the small buys he was used to facilitate.

   CS1's alleged relationship with SYLVIN is even *more* troublesome, considering the Government's position. The Discovery herein alleges that (a.) **CS1 had asked SYLVIN to partner** on a quantity of cocaine and SYLVIN allegedly left the possibility open and (b.) **CS1 is alleged to have requested to work with SYLVIN** in his alleged narcotics "organization," again, a possibility that was allegedly *clearly left open* by *SYLVIN*. Again, there is no evidence whatsoever that the Government sought to follow through with these clear cut avenues into the "organization." To date, the Government has not answered the question,

what, if anything they did to follow up on these opportunities, to the contrary, they have never addressed same in writing or oral arguments. * *It should be noted that the Government's own argument as to why CSs are easier to use to infiltrate appears in their next argument against their ability to use undercover agents:* **"Agent Rainwater then explained why undercover agents could not be utilized. Quite different from <u>a confidential source</u>, <u>who is known to the targets</u>, <u>has associated with the targets</u>, <u>who had gained the trust of the targets from many years of association</u>, an undercover agent would have to be introduced."** These are the Government's own words. **Clearly, the fact that CS1 and CS2 had made more than six (6) undercover buys from STERLIN and SYLVIN respectively, <u>and each had an open door to additional deals</u>,** *with specific options left open* **(and caught on tape), CS1 and CS2 <u>knew the targets</u>, <u>were associated with them</u>, <u>had gained their trust</u>** and *should have been used* (*in <u>at least an attempt</u>*) to infiltrate the "organization."

6.  The Government's position that surveillance did not work is also untenable. First, notwithstanding the defendants' occasional suspicions that they were being watched, the **Government <u>continued</u> their surveillance on a regular basis**, (and the defendants allegedly continued their illegal activities) as set forth in the numerous investigative reports. Additionally, *throughout the investigation* **LEOS actually stopped several of these subjects** on the street. At **least one LEO has recently indicated that agents on occasion would approach these subjects and communicate with them, not undercover, but as federal agents (in response to a question regarding how they would identify certain voices on tape)**. If the agents routinely made themselves known to the targets, how does the Government now argue the fact that the subjects were *suspicious* as grounds for "necessity" of a wire tap?

3

7. The Government contends that undercover agents could not be used. Considering the fact that **they *never* attempted to utilize CS1 and CS2** to infiltrate the "organization," (even with open doors to further dealing), how can the Government claim that undercover agents were not possible? If they did not pursue infiltration by the CSs, they cannot claim the inability to infiltrate by undercover agents, who could possibly have been introduced by the successfully deployed CSs (*had they* been tried).

8. As for any arguments that no CS information was utilized to obtain subsequent wire tap authorizations, defendants would submit that if the first application was tainted and information from same was utilized for the subsequent applications, they too would be tainted.

9. The Government further contradicts its own arguments in the same RESPONSE. They cite case law that suggests law enforcement does not have to utilize a CI before requesting a wire tap, but the case they cite indicates the defendant in that instance was **"wary"** of the utilized law enforcement techniques. In the case at bar, *not only were the targets not wary of the CIs*, **they had given them open invitations to continue doing narcotics activity.**

Additionally, the Government claims on one hand that the CSs were only able to conduct small transactions with the targets, but again, they never address why they didn't follow up on these "small" controlled calls, and resulting buys.

The Government's argument that the CSs would only enable them to prosecute *lower* level conspirators, flies in the face of their *actual* prosecution theory, which alleges that SYLVIN is the alleged lead defendant and STERLIN is his alleged lieutenant. Hence, these two individuals, who are alleged to be the *top* level conspirators were already dealing with the CSs in this case, *prior* to the application for a wire tap.

4

The Government's argument that they could only have prosecuted the pre-wire tap activities for "small individual instances of crack cocaine or powder cocaine purchases," also does not hold water. First, there was no reason (that they have put forth) that suggests that they could not make additional purchases of cocaine from the targets through their CSs. To the contrary, the evidence shows that this *was* available to them (to increase the amount of cocaine they eventually purchased). Second, even the (multiple ounce) amounts purchased *before* the wire, could have resulted in State Trafficking charges, that with minimum mandatory statutes, would have subject the defendants' pre-wire activities to the same, *if not more* criminal liability than they are facing in federal court.

10. Finally, the defendants will rely on their previously filed pleadings regarding the *Franks* violation and Disclosure of the Confidential Informant, specifically noting the Government's stated position in their RESPONSE that the defense can attack the veracity of the agents testifying at trial or the authenticity of the investigation by virtue of the CS working both sides of the fence, by asking the agents such questions.

WHEREFORE, Defendant, JUNIOR SYLVIN, by and through his undersigned counsel and on behalf of all his co-defendants who have been authorized to adopt his motions, respectfully requests that this Honorable Court suppress as evidence in any proceedings herein, the intercepted communications obtained from the wire taps in this case as well as any evidence obtained there from and for disclosure of the Confidential Informant(s) herein.

Respectfully Submitted,

BARRY S. GREFF, ESQ.
Attorney For Junior Sylvin
1112 Weston Rd. Suite 207
Weston, FL 33326
(954) 384-0042

__/s/__*Barry S. Greff*_____
By BARRY S. GREFF
FL Bar No.359963

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to all parties by ECF on April 20, 2010.

BARRY S. GREFF, ESQ.
Attorney For Junior Sylvin
1112 Weston Rd. Suite 207
Weston, FL 33326
(954) 384-0042

__/s/__*Barry S. Greff*_____
By BARRY S. GREFF
FL Bar No.359963